Gary KUCINICH et al., Plaintiffs,

v.

George FORBES et al., Defendants.

No. C76–1317.

United States District Court,
N. D. Ohio, E. D.

Feb. 10, 1977.

Jack M. Schulman, Terence E. Copeland, Bruce Tyler Wick, Cleveland, Ohio, for plaintiffs.

Adrian B. Fink, Jr., Fink & Greene, James R. Willis, Cleveland, Ohio, for defendants.

Spencer Neth, Cleveland, Ohio, for American Civil Liberties Union of Greater Cleveland, amicus curiae.

## ORDER

MANOS, District Judge.

On December 16, 1976 the plaintiff Gary Kucinich [1] filed a motion for a temporary restraining order, together with a complaint for permanent injunctive relief, requesting that the defendant Cleveland City Council members be enjoined from implementing a two week suspension of the plaintiff from his position on the Cleveland City Council and for damages resulting from the suspension order. A hearing on the motion for a temporary restraining order was held in chambers on the afternoon of December 16, 1976 with attorneys representing both sides present. At the conclusion of the hearing

1. Dennis Kucinich was listed as a co-plaintiff in the action. He alleged that he was a resident of the district, Ward 7, which was represented by Gary Kucinich in Cleveland City Council, and that the suspension of his representative would unconstitutionally disinfranchise him.

the motion for a temporary restraining order was granted, and the defendants were restrained from implementing the suspension order until December 27, 1976. Pursuant to a stipulation by the parties the temporary restraining order was extended until January 5, 1977. On January 5 a hearing was held on the permanent injunction.[2]

## FINDINGS OF FACTS [3]

On Monday, December 13, 1976 a meeting was held of the Cleveland City Council (Council). It was presided over by George Forbes, the President of the Council. During this session Council engaged in a debate on the merits of tax abatement legislation. This legislation was sponsored by Council President George Forbes, among others. *See,* Tr. 43. At one point in the debate the plaintiff, Councilman Gary Kucinich, was given the floor by the Council President for the purposes of speaking on the tax abatement legislation. The following colloquy occurred:

MR. KUCINICH: Thank you, Mr. Chairman.

Mr. Chairman, Mayor Perk, fellow councilmen: Mr. Chairman, I am opposed to this ordinance and I feel this ordinance and the content of it is tantamount to the Council of the City of Cleveland raising the taxes of our constituents.

Mr. Chairman, I don't think we want to do that, yet this is what we will do if we vote for this ordinance.

Mr. Chairman, at a time when the people of this city are paying the highest taxes in the history of this county, we should be ashamed of ourselves for bringing this type of legislation before this body. Where is the tax abatement for the people of the city? Where is the tax relief for them? Many of the members of Council argue that they don't have anything to do with bringing tax relief for their constituents, that they cannot, which is probably true. But it is also true, Mr. Chairman, that this tax abatement issue will force an undue burden of taxation on the people who will be forced to pay for the increased development.

Mr. Chairman, there is another underlying factor regarding this legislation which I feel that, Mr. Chairman, is of utmost importance to this Council. Mr. Chairman, at this time I would like to call the Law Director to the mike.

MR. FORBES: Question?

MR. KUCINICH: Thank you. Mr. Chairman, Law Director, Mr. Douglas, the Growth Association is one of the chief proponents of this piece of legislation. The Council President has admitted that the Growth Association has offered him a few thousand dollars to throw a party for the kids in various councilmen's wards.

My question, Mr. Chairman, Mr. Douglas, is one of ethics.

MR. FORBES: Just one moment. Just one moment.

MR. KUCINICH: Mr. Chairman, I would like to ask the Law Director whether it is appropriate for this legislation to be before this body when such an offer was made to the Council President?

Mr. Chairman, I think the question is in order and I would ask that the Law Director be allowed to respond.

MR. FORBES: Are you inferring that I was bribed?

MR. KUCINICH: Mr. Chairman, I'm not making any charges of payoff.

MR. FORBES: Just a moment. You did your thing. You have done your thing. You made a very serious accusation. Just one moment.

---

2. The parties stipulated to the consolidation of the motion for a preliminary injunction with the motion for a permanent injunction. *See,* Tr. 76. While the question of damages is raised in the complaint, that issue is not currently before the Court. Likewise, the Court has not yet afforded the parties an opportunity to develop facts pertinent to the question of whether an award of attorneys fees is appropri-ate in this case. *See,* 90 Stat. 2641, Public Law 94–559, effective October 19, 1976, 42 U.S.C. § 1988.

3. The only substantive evidence introduced at the hearing on the motion for a permanent injunction was a video tape of the Council meeting held on December 13, 1976.

MR. KUCINICH: I'm asking whether it is proper—

MR. FORBES: Just one moment. Mr. Douglas—

MR. KUCINICH: Perhaps if we had a—

MR. FORBES: Just one moment. I think everybody heard you. This is a very—I take it to be a very serious accusation.

MR. KUCINICH: It's not a question of payoff, Mr. Chairman, it's a question whether it's proper or not.

MR. FORBES: Just one moment, Mr. Kucinich. Just one moment. Please.

Mr. Kucinich stated that the Growth Association was the chief proponent of this legislation, that was the first statement that was made.

Mr. Kucinich then stated that the Growth Association had offered me 2 thousand dollars. This is not the usual Council rhetoric.

MR. KUCINICH: Mr. Chairman, you have been offered 2 thousand dollars.

MR. FORBES: Just one moment. Mr. Kucinich has inferred that I was offered 2 thousand dollars by the Growth Association for passage of this legislation.

MR. KUCINICH: Not for the passage of this legislation, Mr. Chairman. You were offered 2 thousand dollars—

MR. FORBES: Mr. Mayor—

MR. KUCINICH: By the chief proponent of this legislation.

MR. FORBES: Just a moment.

MR. KUCINICH: Not for the passage. No accusation of payoff on this legislation.

MR. FORBES: My integrity, I insist, I insist, I'm not going to leave here with the people in this audience, my colleagues, the media broadcasting this that somehow I have taken 2 thousand dollars.

MR. KUCINICH: I said you were offered, Mr. Chairman, which is exactly correct. There were members of this Council who were present when you stated that you were offered 2 thousand dollars from the Growth Association for a Christmas Party for kids in the wards.

And I am asking whether or not it's appropriate at the time when this legislation is before this body.

I asked the Law Director a valid question. No charge of payoff was made and if there is any inference of payoff charge, I would respectfully submit that that is not the point, Mr. Chairman. The point is that we now have before this Council legislation which affects the Growth Association. And the point, Mr. Chairman, is that the Growth Association did offer you 2 thousand dollars for a party in the downtown area so that the councilmen could bring the kids down there.

MR. FORBES: I'm going to ask you point blank, are you inferring that I took 2 thousand dollars to pass this legislation?

MR. KUCINICH: No, Mr. Chairman, not at all. That is not my intent. My intent—

MR. FORBES: Just a moment. Sit down. You're out of order.

*See*, Tr. 20–25.

Kucinich sat down as he was requested to do. Councilman Moss then took the floor and moved that Kucinich be suspended for violating the Council rules of decorum. *See*, Tr. 26–27. Forbes ruled that Moss' motion would be entertained after Council had disposed of the tax abatement legislation, which it promptly proceeded to do. Debate on the motion to suspend was then opened.

A total of 18 councilmen spoke on the motion to suspend Gary Kucinich from Council. One of the early speakers was Councilman Moss who renewed his motion to suspend Gary Kucinich from Council for two weeks without pay because he had violated Council Rule 23. *See*, Tr. 46–47, 82–83. Rule 23 reads:

"Right to floor. When any member is about to address the Council, he shall rise from his seat and respectfully address himself to the presiding officer, and when recognized by the Chair shall confine himself to the question under debate, avoid personalities and refrain from im-

puning (sic) the motives of any other member's argument or vote." [4]

The precise conduct by Kucinich which allegedly violated Rule 23 was never stated. However the Court finds that Council and Kucinich understood that the plaintiff Kucinich was charged with "impugning the motives" of Council President George Forbes by allegedly inferring in a question to Assistant Law Director Malcolm Douglas that Forbes had accepted money for the passage of the tax abatement legislation. This finding is supported by the statement made by Council members during debate on the motion to suspend.

Councilman Strand stated:

"I do feel that in this situation when there was a blatant insinuation of something that everybody in this room knows wasn't true, including the man who made the insinuation, that absolutely he deserves a censure . . . ." Tr. 63.

Councilman Zunt stated:

"But I do consider Mr. Kucinich's remarks purely political, of the basest sort and that is to impugn the reputation of a fellow colleague because he had a kind thought or because he cared for some poor children who rarely get downtown, who rarely have a treat, and who may never have been or never would be able to be entertained by some of the leaders in the City of Cleveland.

"Mr. President, I will gladly join with you in planning this Christmas party and accept whatever responsibility falls with it.

"And I would recommend to this body discipline for Mr. Kucinich of the most sternest sort." Tr. 69–70.

Councilman Collier stated:

"I've seen tough fights under Jim Stanton's administration, I've seen tough fights under Tony Garafoli's administration. But I've never seen any member to stoop as low as some of my colleagues in this body have.

"Last week we had a colleague accuse everybody here of being on the take. That died.

"This week we got one of the same members of that group accusing the President of being on the take. I'm pretty sure if the news media and the County Prosecutor would do some investigating on these gentlemen, they might find them on the take.

". . . Mr. President, I stand ready tonight to vote on whatever the penalty must be." Tr. 59–60.

Councilman Bonanno stated:

"If we're going to have rules, the rules must apply to everyone, they must apply to you as well as myself. They must apply to Kucinich as well as Collier.

"Now, Councilman Collier also made an allegation, an accusation. Now, if rules are rules and the law is law, the same suspension or censure or expulsion that applies to Kucinich should also apply to my colleague from the 17th Ward. He made the same allegation. And tonight we will see if rules apply to everyone." Tr. 71.

Councilman Kucinich said:

"Mr. Chairman, I find it hard that I am being charged with something because I don't feel that I've done anything wrong. And I'll not apologize for anything if I did, by some insinuation, make you feel that I was implying that you were accepting that 2 thousand dollars to vote against the ordinance, then I'm sorry. But that was not the intention, Mr. Chairman. The intention was to get a response from the Law Director as to

---

**4.** Section 29 of the Charter of Cleveland reads:

"Rules of Council. The Council shall determine its own rules and order of business and shall keep a journal of its proceedings. It may punish or expel any member for disorderly conduct or violation of its rules. No expulsion shall take place without the concurrence of two-thirds of all the members elected nor until the delinquent member shall have been notified of the charges against him and been given an opportunity to be heard."

It was pursuant to this section that Council felt empowered to suspend Gary Kucinich. The plaintiff has not raised the issue of whether Section 29 allowed the suspension, as opposed to the expulsion, of Council members.

whether there was any ethical question."[5] Tr. 80.

At the conclusion of the debate Kucinich rose and spoke in his own defense, after which a vote on the motion to suspend was taken. The motion passed 26 yeas to 4 nays, with the 26 councilmen named as defendants in this case voting for the suspension.[6]

## CONCLUSIONS OF LAW

The plaintiff Gary Kucinich claims the following:

1. That his suspension from Cleveland City Council unconstitutionally penalizes him for the exercise of his protected First Amendment right to freedom of speech.

2. That Council Rule 23 is unconstitutionally overbroad.

3. That Council Rule 23 is unconstitutionally vague.

4. That his punishment for violating Rule 23 unconstitutionally deprived him of due process because there is no evidence that he violated Rule 23.

The plaintiff Dennis Kucinich claims that he will be denied equal protection if Councilman Gary Kucinich is suspended because he will thereby be disinfranchised.

In response, the defendants argue the following:

1. That the Court does not have subject matter jurisdiction over this case because the judiciary may not inquire into the internal procedures of a legislative body.

2. That no justiciable controversy is presented because the issue is fundamentally a political one which the legislative branch must handle in its discretion.

3. That the defendants are immune from suit under the speech and debate clause of the United States Constitution.

4. That Rule 23 is not overbroad or vague.

5. That Gary Kucinich was afforded due process and was not punished for the exercise of his First Amendment rights.

6. That Dennis Kucinich will not be denied equal protection by the suspension of Gary Kucinich.

## JURISDICTION

A federal district court has jurisdiction over the subject matter of a lawsuit if (1) the cause "arises under" the Federal Constitution, federal laws or treaties, *see, e. g., Osborn v. Bank of United States,* 9 Wheat. 738, 819–820, 6 L.Ed. 204 (1824); (2) the cause is a "case or controversy," *see, e. g., Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911); and the cause is described by a statute granting jurisdiction in federal court. *See, e. g., Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The Court finds that this case "arises under" the First Amendment to the Constitution of the United States; there is a case and controversy; and the cause of action is described by 28 U.S.C. § 1343(3)[7] which grants jurisdiction to federal courts. *See, Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Powell v. McCormack,* 395 U.S. 486, 512–513 and fn.

---

5. A total of 18 councilmen spoke on the motion to suspend. Fifteen Councilmen, Collier (Tr. 59), Strand (Tr. 63), Madison (Tr. 31), Zunt (Tr. 70), Franklin (Tr. 73–74), Oakar (Tr. 77–78), Trenton (Tr. 56–57), Body (Tr. 33–34), Turner (Tr. 54), Lynch (Tr. 36), Kowalski (Tr. 55), Forbes (Tr. 45), Russo (Tr. 48), Bonanno (Tr. 71) and Kucinich (Tr. 79), indicated in their speeches that they would vote for or against the motion to suspend based on whether they found that Kucinich had in fact impugned the motives of Forbes. Two others, Councilmen Ballou and McCall gave no indication in their speeches of what they thought the charges were. Only Councilman Moss expressed the opinion that Kucinich should be suspended for

not only his alleged impugning of Forbes, but also for his conduct in failing to follow the procedural orders of the Chair.

6. The parties stipulated that Dennis Kucinich was a resident of the ward represented in Council by Gary Kucinich. Tr. 4.

7. The Court finds that the state action requirement of 42 U.S.C. § 1983 is satisfied in this case. *See, Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Ammond v. McGahn,* 390 F.Supp. 655, 658–660 (D.N.J., 1975), rev'd 532 F.2d 325 (3rd Cir., 1976).

35, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Ammond v. McGahn,* 390 F.Supp. 655 (D.N. J.1975), rev'd 532 F.2d 325 (3rd Cir. 1976). The complaint stated a claim for relief based on an alleged deprivation of plaintiff's civil rights under 42 U.S.C. § 1983.[8]

 The Court finds that it has subject matter jurisdiction over this case.[9]

## JUSTICIABILITY

The defendants argue that the United States Constitution provides for a separa-

8. The defendants argue that they are immune from suit on two grounds. The first argument is that the speech and debate clause of the Constitution of the United States, Article I, Section 6, immunizes the defendants from suit for acts taken in their official capacity. In the case of *Eslinger v. Thomas,* 476 F.2d 225, 228 (1973), the 4th Circuit stated, "the protection of the speech or debate clause of the Constitution of the United States has been extended to state legislators. *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019." This court disagrees that *Brandhove* extended the application of the speech and debate clause to the states. *Brandhove* was a case in which the Supreme Court was faced with deciding whether the Civil Rights Act, 8 U.S.C. § 43 (now 42 U.S.C. § 1983) exposed state legislators to liability for money damages for acts committed while in their official capacities. The scope of *Tenney* is confined to the narrow question of the statutory construction of § 1983. The *Tenney* court was not faced with, nor did it decide, the question of whether the speech and debate clause applies to state legislators. As the court stated:

"We think it is clear that the legislation on which this action is founded (42 U.S.C. § 1983) does not impose liability on the facts before us, once they are related to the presuppositions of our political history." *Tenney v. Brandhove, supra,* 341 U.S. at 372, 71 S.Ct. at 786. The question discussed in *Brandhove* was whether Congress *intended* to hold state legislators liable for damages, *not* whether they had the power to hold them liable, which they would not have had if the speech and debate clause applied to the states. By discussing Congress' intent, the Supreme Court in *Tenney* decided, *sub silentio,* that the speech and debate clause does not apply to the states. *See, Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr.App., 1974).

The defendants' second argument is that they are immune under 42 U.S.C. § 1983, as § 1983 was not intended to allow suits against legislators. As is discussed above the Supreme Court in *Tenney v. Brandhove* found that *state* legislators had an immunity from damage actions. Only a qualified immunity exists for legislators of a municipality. *See, e. g., Lynch v. Johnson,* 420 F.2d 818, 821 (6th Cir., 1970); *Parine v. Levine,* 274 F.Supp. 268, 269 (E.D.Mich.S.D., 1967). Further it is this Court's view that the *Tenney* case grants immunity to individual legislators from damage actions predicated on § 1983, but not from being enjoined, under § 1983, from enforcing an unconstitutional sus-

pension of a duly elected member of the legislative body. Here, the plaintiff is requesting that the defendant City Council President George Forbes, *inter alia,* be restrained, in his administrative as well as legislative function, from enforcing the allegedly unconstitutional suspension. There is no immunity under 42 U.S.C. § 1983 from such suits. *See, Scheuer v. Rhodes,* 416 U.S. 232, 238–240, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Rowley v. McMillan,* 502 F.2d 1326, 1331 (4th Cir., 1974) (". . . the doctrine of immunity . . . has no application to a suit for declaratory or injunctive relief"); *Saffioti v. Wilson,* 392 F.Supp. 1335, 1343–1344, fn. 10 (S.D.N.Y., 1975); *Richmond Black Police Off. Ass'n v. City of Richmond,* 386 F.Supp. 151, 154 (E.D.Va., 1974); *cf., Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). *See also, Bond v. Floyd,* 251 F.Supp. 333, 335 and 338 (N.D.Ga., 1966).

9. In addition to alleging jurisdiction under 28 U.S.C. § 1343(3) the plaintiff alleged it under 28 U.S.C. § 1331. However for this Court to entertain a case pursuant to § 1331 the plaintiff must allege and prove in excess of $10,000 damages. At the hearing on the permanent injunction the only proof of damage offered was the alleged loss of First Amendment rights. The Sixth Circuit in *Goldsmith v. Sutherland,* 426 F.2d 1395 (1970) found that the $10,000 requirement of § 1331 "cannot be founded on a right secured by the Constitution unless it is capable of money valuation." *Id.* at 1397. Though this decision has been criticized within the circuit, *see, Kelley v. Metropolitan County Board of Education, Tenn.,* 372 F.Supp. 528, 537–538 (M.D.Tenn., 1973), and has been rejected in other circuits, *see, Spock v. David,* 502 F.2d 953, 957 (3rd Cir., 1974), rev'd on other grounds in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), *Goldsmith* was recently reaffirmed by the circuit, *see, Amen v. City of Dearborn,* 532 F.2d 554, 560 (6th Cir., 1976). While this Court does not find the rule of *Goldsmith* persuasive it is bound to follow that rule. Therefore the Court finds that it does not have jurisdiction in this case under § 1331 because the $10,000 amount requirement has not been established. The Court notes, however, that had the plaintiffs alleged a claim based *solely* on the First Amendment, and punitive damages, the Court might sustain jurisdiction, at least for an injunctive action under § 1331 in addition to the jurisdictional grounds already delineated. *See, Hanna v. Drobnick,* 514 F.2d 393, 398 (6th Cir., 1975).

tion of powers among the executive, legislative and judicial sectors of government; and that there are certain questions of a political nature, which the judiciary should not adjudicate, but must leave for decision to the legislative and executive branches of government. The defendants contend that the internal procedures of the Cleveland City Council are fundamentally "political questions" which may not be reviewed by the courts for defects.

■ The principle of nonjusticiability because of a political question was recognized in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker* the court described the following test to determine whether a case involved a political question:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Baker v. Carr, supra* at 217, 82 S.Ct. at 710.

However, the "political question" doctrine of *Baker* was announced in the context of the United States Constitution's require-ment for the separation of powers. The Supreme Court has not recognized its use in governing the federal judiciary's relationship to the states.

"A question presented to this Court for decision is properly deemed political when its resolution is committed by the Constitution to a branch of the Federal Government other than this Court. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Thus, 'it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the "political question." '. . . . The short answer to this argument is that the separation of powers principle, like the political question doctrine, has no applicability to the federal judiciary's relationship to the States." *Elrod v. Burns*, 427 U.S. 347, 351, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547. *See also, Baker v. Carr, supra*, 369 U.S., at 210, 82 S.Ct. 691; *United States v. Nixon*, 418 U.S. 683, 692–697, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

Further, this case does not revolve around a "political question" as that term is used in *Baker v. Carr* but rather a question for which federal courts have been the final arbitrator throughout the existence of the United States; the interpretation of the United States Constitution. *Marbury v. Madison*, 1 Cranch 137, 174 (5 U.S. 137, 174), 2 L.Ed. 60 (1803). Here the court is asked to determine whether the plaintiff's right to freedom of speech has been violated by the defendants. This is not a "political question", but a question of constitutional construction concerning the most fundamental right enjoyed by Americans, the right to freedom of speech. As the Supreme Court recently stated:

"More fundamentally, however, the answer to petitioners' objection [the objection was the case revolved around a political question and that the judiciary's handling of it would violate the separation of powers doctrine] is that there can be no impairment of executive power, whether

on the state or federal level, where actions pursuant to that power are impermissible under the Constitution. Where there is no power, there can be no impairment of power. And our determination of the limits on state executive power contained in the Constitution is in proper keeping with our primary responsibility of interpreting that document." *Elrod v. Burns, supra,* 427 U.S. at 352, 96 S.Ct. at 2679.

 The Court finds that this case is justiciable.[10]

## FIRST AMENDMENT [11]

The right to freedom of speech is the cornerstone of the American system of government. Our democracy requires full, open and robust debate without fear of punishment to survive and prosper. Only by the free exchange of information and ideas can Americans and their elected legislators hope to make reasoned, logical and wise decisions. As the Supreme Court stated,

"The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1930); *see, e. g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 632, 46 L.Ed.2d 659; *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

In order to insure that freedom of expression is given the breathing space it needs to survive, controversial and even onerous forms of expression are given protection. *See, e. g., N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969), ["It is firmly settled that under our Constitution the public expression of ideas may not be

10. The Court has considered *sua sponte* and rejects the possibility of employing the abstention doctrine in this case. Abstention is limited to "special circumstances," most notably cases in which a statute is challenged as being unconstitutionally overbroad and therefore "obviously susceptible of a limiting construction" by a state court. *Zwickler v. Koota,* 389 U.S. 241, 251, fn. 14, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967); *see also, Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). As is discussed *infra* the Court finds that the language of Rule 23 is not vague, but is unconstitutionally overbroad. However, Rule 23 is not easily susceptible to a limiting construction that would eliminate the constitutionally defective overbreadth. Furthermore, even if the facial overbreadth of the rule could be eliminated, the rule, as applied to the plaintiffs in this case, has been invoked to punish the exercise of pure expression and the important associational right to vote. The *application* of any rule, regardless of its facial validity or invalidity which trespasses on pure expression, or important associational rights like voting, egregiously violates the First Amendment, unless the government can justify such application by demonstrating a clear and present danger to society which overrides the individual's fundamental core-First Amendment interest in pure expression or voting. In a First Amendment case to require the plaintiff to suffer a substantial delay in obtaining relief from such egregious governmental interdictions of his core-

First Amendment interests without the pendency of state quasi-criminal proceedings is reprehensible. *Compare, Huffman v. Pursue,* 420 U.S. 592, 607–611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *McNea v. Garey,* 434 F.Supp. 95 (N.D.Ohio, 1976). As the Supreme Court stated:

"These principles have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment. In such case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota, supra,* 389 U.S. at 252, 88 S.Ct. at 397–398. *See also, Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 2864, fn. 10, 49 L.Ed.2d 844 (1976); *McNeese v. Board of Education,* 373 U.S. 668, 671–676, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 415–416, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

11. The First Amendment to the Constitution of the United States reads,

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

prohibited merely because the ideas are themselves offensive to some of their hearers."]; *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941); *New York Times Company v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), ["Thus we consider this case against the background of a profound national commitment to the principle that debate on the public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials."]

■ The extent of the protection afforded conduct [12] varies with the form the conduct takes, and the time and place during which it occurs. If the conduct takes the form of simply and unobtrusively communicating an idea, with the physical action element of the conduct limited to the extent necessary to transmit the idea, then the conduct is *pure expression or speech* and is entitled to the highest degree of protection. *See, Tinker v. Des Moines Independent Com. Sch. Dist.,* 393 U.S. 503, 505–506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976). To restrict pure speech conduct, the state must show that: (1) A clear and present danger is presented to society by the pure speech.[13] *See, Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470; *City of Madison, etc. v. Wis. Emp. Rel. Com'n.,* 429 U.S. 167, 173–176, 97 S.Ct. 421, 425–426, 50 L.Ed.2d 376 (1976); *Carroll v. President and Commissioners of Princess Anne County,* 393 U.S.

175, 180, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Dennis v. United States,* 341 U.S. 494, 505, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); (2) The individual's interest in allowing the pure speech conduct is insufficient when balanced against the danger presented to society by allowing the conduct; and (3) The government has used the narrowest restriction on pure speech consistent with the furtherance of the governmental interest involved. *See, Keyishian v. Board of Regents of U. of the St. of N.Y.,* 385 U.S. 589, 602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ When the physical action element of the expression become more than just an unobtrusive means to communicate an idea, then the conduct is called *speech plus* and is entitled to a lower degree of protection than *pure speech. See, United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Cox v. Louisiana,* 379 U.S. 536, 555–556, 85 S.Ct. 453, 13 L.Ed.2d 471,[14] (1965); *Buckley v. Valeo, supra,* 424 U.S. 1, 96 S.Ct. at 633 (1976). To restrict *speech plus* the state must show that: (1) A substantial interest of society will be affected by the *speech plus conduct. See,. e. g., United States v. O'Brien, supra,* 391 U.S. at 376–377, 88 S.Ct. 1673; (2) The individual's interest in allowing the speech plus conduct is insufficient in comparison with the detrimental effect the conduct will have on society; and (3) The government has used the narrowest restriction on pure speech consistent with the furtherance of

---

**12.** "Conduct" as used here can either be pure expression or pure action or a combination of both. *See,* Emerson, The System of Freedom of Expression, p. 17, Vintage, 1970.

**13.** As Justice Oliver Wendell Holmes stated: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck, supra,* 249 U.S. at 52, 39 S.Ct. at 249.

**14.** The court in *Cox* stated: "We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom of those

who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. *See* the discussion and cases cited in No. 49, post, [379 U.S. at p. 563, 85 S.Ct.] at p. 480. We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co., supra,* 336 U.S. [490], at 502, 69 S.Ct. [684], at 691, 93 L.Ed. 834, that 'it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Cox, Id.,* 379 U.S. at 555–556, 85 S.Ct. at 464–465.

the governmental interest involved. *See, e. g., Keyishian, supra,* 385 U.S. at 602, 87 S.Ct. 675.

The Court makes the factual finding that the plaintiff, Gary Kucinich, was punished for allegedly slandering George Forbes. In other words the plaintiff was punished for the idea content of his speech, not the failure to yield the floor when ordered, nor for any other action. Thus the Court finds the plaintiff was punished for the exercise of "pure speech."

Applying the standard discussed above, the defendants have failed to prove that Gary Kucinich's speech on December 13, 1976 represented a clear and present danger to society, or anything else. The defendants argue, in substance, that defamatory speech must be excluded from Council chambers so as to insure the efficient operation of Council, and that anything that interferes with the efficient operation of Council is subject to action by Council. However, the record before the Court does not show that Council's efficiency was effected by what Kucinich said that night. The record shows that after the allegedly slanderous remarks Council returned to the consideration of the tax abatement legislation and passed it.[15] Further this Court does not believe that the statements that Gary Kucinich made could ever be construed as creating a clear and present danger to society,[16] no matter how the Cleveland City Council reacted. This result is mandated by a series of decisions handed down by the United States Supreme Court. In *Keyishian v. Board of Regents of U. of the St. of N.Y.,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) the Supreme Court reversed the decision of a district court upholding a New York statute which made treasonable or seditious words a cause for dismissal from employment in public schools. The court stated,

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' The classroom is peculiarly the marketplace of ideas.'" (citations omitted). *Keyishian, supra* at 603, 87 S.Ct. at 683.

Surely a legislative body rates at least equal to a classroom as to the right to express opinions and ideas. *See also, Papish v. Board of Curators of the University of Missouri,* 410 U.S. 667, 670–671, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973).

**15.** An analogous case in which the lack of evidence of any effect on the governmental institution was held to be decisive was *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), in which the Supreme Court reversed the contempt conviction of a publisher of out-of-court statements attacking a grand jury investigation. In reversing the Supreme Court noted the importance of the administration justice, but found that the published reports had not been shown to have had an effect on the grand jury.

"The prosecution called no witnesses to show that the functioning of the jury was in any way disturbed; no showing was made that the members of the grand jury, upon reading petitioner's comments in the newspapers, felt unable or unwilling to complete their assigned task because petitioner 'interfered' with its completion. There is nothing in the record to indicate that the investigation was not ultimately successful or, if it was not, that the petitioner's conduct was responsible for its failure." *Id.* at 387, 82 S.Ct. at 1371.

**16.** The United States Supreme Court has found that a clear and present danger existed in the cases of *Schenck v. United States, supra,* and *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In *Schenck* the court reviewed a case in which the defendant had circulated leaflets containing "impassioned" language advising men to resist the draft during World War I. In *Chaplinsky* the court reviewed a case in which the defendant had verbally attacked a city marshal in such language that it created a clear and present danger of a breach of the peace. The fact pattern of neither *Schenck* nor *Chaplinsky* are analogous to the instant case. The words spoken by Kucinich were not "fighting words" that were likely to cause civil disorder, nor were they likely to cause a danger to our armies in the time of war.

In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) the court overturned, in part, the Federal Election Campaign Act as restricting freedom of speech, saying,

"The First Amendment affords the broadest protection to such political expression in order 'to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Id.* 96 S.Ct. at 632.

Finally, in *Bond v. Floyd* the Supreme Court decided a case analogous to the one before this Court. In *Bond* the plaintiff, Julian Bond, was elected to the Georgia House of Representatives but was excluded from taking his seat because of a statement he made criticizing the federal government's policy in Viet Nam. The Supreme Court held that the exclusion of Bond from the Georgia House violated the First Amendment:

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), is that 'debate on public issues should be uninhibited, robust, and wide-open.' We think the rationale of the *New York Times* case disposes of the claim that Bond's statements fell outside the range of constitutional protection. Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected. The State argues that the *New York Times* principle should not be extended to statements by a legislator

because the policy of encouraging free debate about governmental operations only applies to the citizen-critic of his government. We find no support for this distinction in the *New York Times* case or in any other decision of this Court. The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators. Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." *Bond, Id.,* 385 U.S. at 135–137, 87 S.Ct. at 349.

 Here, as in *Bond,* a legislator has been penalized for the idea-content of his speech, without the government establishing a clear and present danger justifying such an imposition on pure speech. This, simply, is an unconstitutional intrusion on the right to freedom of speech guaranteed by the First Amendment of the United States Constitution and can no more be done by the Cleveland City Council than it could by the Georgia House. *See, e. g., Hudgens v. N.L.R.B.,* 424 U.S. 507, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *DeJonge v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937). The alleged defamation of George Forbes can be brought to court and litigated,[17] but it can-

17. When defamation is alleged against a "public figure," the allegedly defamed person has the burden to prove that the alleged defamor acted with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Company v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11

L.Ed.2d 686 (1964). As the Supreme Court stated,

"The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with

not be used as an excuse to stifle dissent. The legislatures of America must endure as open forums for the expression of all ideas and opinions.[18]

## VAGUENESS

The Supreme Court has stated, "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).[19] *See, e. g., Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975); *Smith v. Goguen,* 415 U.S. 566, 572–573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Statutes or regulations which impinge upon a right protected by the First Amendment must have a ". . . greater degree of specificity than in other contexts." *Goguen, supra* at 573, 94 S.Ct. at 1247, so as to insure that citizens will not be "chilled" from exercising their fundamental constitutional rights. *See, e. g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Stromberg v. California,* 283 U.S. 359, 369–370, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Edwards v. South Carolina,* 372 U.S. 229, 238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

▮ The standard used in determining whether a statute or rule is vague is whether ". . . men of common intelligence

which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).

It appears, from the record before this Court, that even if the statement by Kucinich could be shown to be defamatory, recovery of damages would be precluded. *See, Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976).

**18.** Had Gary Kucinich refused to yield the floor after being instructed to do so by Council President Forbes, or upon yielding the floor had he disrupted debate, for example, by screaming invectives at Forbes, then Council might have been able to punish him without violating the First Amendment. The Court reaches this conclusion because by refusing to yield the floor or by interrupting debate, even if done vocally, Kucinich's conduct would no longer have been *pure speech* but would have been *speech plus,* as the physical action element of the expression becomes more than just an unobtrusive means to communicate an idea or opinion. *Speech plus* is not entitled to the same degree of protection as *pure speech. See, Cox, supra,* 376 U.S. at 555, 85 S.Ct. 453 [in which the Supreme Court found picketing to be speech plus]; *O'Brien, supra,* 391 U.S. at 376, 88 S.Ct.

1673 [in which the Supreme Court finds the burning of a draft card at an anti-war rally to be speech plus]. In order to be able to limit speech plus the government must show that a substantial interest of society is affected. Here the society has a substantial interest in the efficient function of Council, so that upon a showing that the efficient function of Council was effected by speech plus conduct, that conduct can be punished. However, as is made clear above, Gary Kucinich was not punished in this case for speech plus conduct, but for pure speech conduct. Further, there is no evidence that he engaged in speech plus conduct.

**19.** The rationale behind the vagueness rule was summed up in *Grayned, supra,* as follows:

"Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden area were clearly marked.' " *Id.,* 408 U.S. at 108–109, 92 S.Ct. at 2298–2299 [footnotes deleted].

must necessarily guess at its meaning." *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973). Applying this standard to Rule 23 the Court finds the rule is not vague. Men of common intelligence can understand what conduct is prohibited.

## OVERBREADTH

■ "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned, supra,* 408 U.S. at 114, 92 S.Ct. at 2302. The plaintiff claims that Rule 23 is overbroad in that it prohibits conduct protected by the First Amendment. In order for a statute or rule to be unconstitutionally overbroad it must, on its face: (1) restrict conduct protected by the Constitution of the United States; and (2) the government's interest in restricting the conduct must be insufficient in comparison to the encroachment on the constitutional right involved or, if a sufficient governmental interest exists to justify the restriction, the statute must fail to employ the narrowest means consistent with the furtherance of that interest. *See, e. g., Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2684–2685, 49 L.Ed.2d 547 (1976).

The language of Rule 23, on its face, reaches protected conduct. It punishes a councilman for "impugning the motives of any other member," thereby restricting expression because of the *ideas* contained in the expression. Further, as was discussed *supra,* the governmental interest in restricting a councilman's speech, namely, the efficient administration of Council, is insufficient when balanced against the category of First Amendment conduct in which Kucinich engaged, i. e., pure speech, the most highly protected category of conduct under the First Amendment. No showing has been made that a clear and present danger to society exists if a rule of the scope and magnitude of Rule 23 is not promulgated. Rule 23 is unconstitutionally overbroad on its face.

## DUE PROCESS

■ The plaintiff claims that his suspension [20] was unconstitutional because he was denied due process [21] of law in that there was no evidence that he violated Rule 23. The plaintiff did not argue in his brief that he was denied a hearing, or that he was unaware of the nature of the charges against him.

■ Rule 23 has the following elements which must be proved before a violation can be said to exist: (1) The accused was a councilman; (2) The conduct that is prohibited occurred in chambers; (3) The accused did not confine himself to the issues under debate; (4) The accused engaged in personalities; and (5) The accused impugned the motives of another councilman's argument or vote.[22]

---

**20.** As previously noted there is no express rule of charter provision which allows for suspension of a councilman.

**21.** The plaintiff has a property right in his position in Council, in that his position has been guaranteed for a given number of years. *See, Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976). The plaintiff may not be deprived of that right without due process. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**22.** The Court recognizes that the evidence in the record supports the conclusion that Kucinich violated Rule 23 by "impugning" the motives of another Council member's argument or vote. However, the Court stresses that the element of impugning another member's argument or vote is egregiously overbroad. It

might be argued that, the word "impugning" without a more precise definition in accord with the *New York Times v. Sullivan,* 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1969) case, exposes legislators to sanctions for pure expression which could not permissibly engender civil liability. *See, Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Thus Rule 23 is overbroad on its face, because at least one of the elements of the rule proscribes a category of conduct which is protected by the First Amendment, without any legislative showing that such proscription is substantially related to a legitimate, important governmental interest. The fact that the evidence supports a finding of guilt with respect to the impugning element does not obviate the overbreadth defect of the statute. But even if this Court were to narrow the overbroad "im-

■ The Court finds that evidence is present in the record which can be applied to each element of Rule 23. *See, Basham v. Pennsylvania Railroad Co.,* 372 U.S. 699, 700–701, 83 S.Ct. 965, 10 L.Ed.2d 80 (1963); *Thompson v. City of Louisville,* 362 U.S. 199, 204, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Therefore due process has not been denied.

## EQUAL PROTECTION

■ The plaintiff Dennis Kucinich claims[23] that the suspension of his representative in Council, Gary Kucinich, violates his constitutional right to equal protection under law, because it establishes two classes of voters; those in Ward 7 who have no representation in Council and those in all other wards who have representation in Council.

The right to vote is "a fundamental political right . . . preservative of all rights." *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964); *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

*But see, San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 59, fn. 2, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); In order to effectuate the right to vote and to make it meaningful, the right to representation, equal representation, must also be considered a fundamental right. As the Supreme Court stated, ". . . the *fundamental* principle of representative government in this country is one of equal representation . . . ." *Reynolds v. Sims, supra,* 377 U.S. at 560–561, 84 S.Ct. at 1381 (emphasis added); *see also, Ammond v. McGahn,* 390 F.Supp. 655, 660 (D.N.J., 1975) rev'd 532 F.2d 325 (3rd Cir. 1976).

"To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. In considering laws challenged under Equal Protection Clause, this Court has evolved more than one test, depending upon the

---

pugning" element with a gloss based on the *New York Times* standard, *see, supra,* 376 U.S. at 279–280, 84 S.Ct. 710, the evidence before the Council would not support a finding of purposefulness, or maliciousness, as required by *New York Times.* Thus, it may be argued that if the rule was confined to its narrowest legitimate scope, the Council would have violated the First Amendment by misapplying a legitimate rule in a fashion that impinged on a citizen's core-First Amendment interest in unobtrusively expressing his ideas and opinions. While the sin of misapplying a statute which, it might be argued, was facially proper, in a fashion that impinges on a protected free speech interest constitutes a First Amendment violation which is analytically different from mechanically applying the facially overbroad portion of an overbroad statute in a fashion that infringes the same free speech interest, the harm to a citizen's First Amendment rights is identical under both analyses. Therefore, whenever a federal court is presented with a case in which the overbroad portion of a state rule has been applied to infringe a citizen's First Amendment interest, without an adequate justification, the sanction imposed pursuant to the rule must be invalidated, despite the fact that the federal court *may* have the power to place a narrowing gloss on the face of the rule. *Cf., Grayned v. City of Rockford,* 408 U.S. 104, 114–121, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Furthermore, this Court believes that this Rule

23, even if cured of its overbreadth by a narrowing construction requiring purposefulness and maliciousness, would still not be constitutional, because the government can never show a clear and present danger, or other sufficiently counterbalancing compelling interest to justify suspending a legislator for unobtrusively expressing his opinions during a Council debate. The application of such a sanction to a legislator, by those who immediately hear his voiced comments, differs significantly from the libel situation involved in the *New York Times* case, *see, Near v. Minnesota,* 283 U.S. 697, 713–723, 51 S.Ct. 625, 75 L.Ed. 1357 (1930). In the libel situation, the imposition of liability for unobtrusive pure expression is predicated on the counterbalancing interest of the need to compensate the person who has suffered tangible injury because of the maliciously false pure expression uttered by a citizen. The suspension of a legislator could never serve such an important counterbalancing interest. Certainly the legislature could not adopt a rule mandating such compensation in "impugning" cases like Kucinich's without unlawfully appropriating a judicial function.

**23.** Dennis Kucinich has standing to raise the issue of his loss of representation. *See, Powell v. McCormack,* 395 U.S. 486, 493, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

interest affected or the classification involved. First, then, we must determine what standard of review is appropriate. In the present case, whether we look to the benefit withheld by the classification (the opportunity to vote) or the basis for the classification (recent interstate travel) we conclude that the State must show a substantial and compelling reason for imposing durational residence requirements." *Dunn v. Blumstein, supra,* 405 U.S. at 335, 92 S.Ct. at 999 (citations omitted).

The defendants must show a compelling reason for depriving Dennis Kucinich of his right to representation. *See, Beer v. United States,* 374 F.Supp. 357, 392 (D.C., 1974), rev'd 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Blawis v. Bolin,* 358 F.Supp. 349, 356 (D.Ariz., 1973). The only interest that the defendants can argue that may be compelling is society's interest in the efficient functioning of the City Council. However, as discussed above, the defendants have made no showing that Gary Kucinich's conduct interfered with the efficient operation of Council. Additionally, this Court finds *no* social interest in the throttling of pure expression.

■ The Court finds that different classes of voters were established by City Council's suspension of Gary Kucinich, and that the governmental interest in establishing those classes of voters is insufficient when balanced against the fundamental interests of the voters to representation. The Court concludes that the defendants violated Dennis Kucinich's constitutional right of equal protection of law guaranteed to each citizen in the Fourteenth Amendment to the United States Constitution.

## CONCLUSION

In conclusion it is this Court's firm belief that neither the average citizen of Cleveland, nor a councilman in Council chambers, can be punished for criticizing or impugning the motives of Cleveland politicians. In our system of government only the electorate in Gary Kucinich's ward are permitted to judge him and punish him for his expression of ideas and opinions.[24]

The defendants are hereby permanently enjoined from enforcing the December 13, 1976 order suspending Gary Kucinich.

IT IS SO ORDERED.

---

24. As the Supreme Court stated in *Powell v. McCormack,* 395 U.S. 486, 547, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491 (1969),

"A fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they please to govern them.' "