**PRINCETON EDUCATION ASSOCIATION et al.**

v.

**PRINCETON BOARD OF EDUCATION et al.**

**No. C–1–79–20.**

United States District Court, S. D. Ohio, W. D.

Feb. 20, 1979.

Robert T. Dunlevey, Jr., Dayton, Ohio, for plaintiffs.

Michael E. Maundrell, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, Chief Judge.

This action came before the Court for a hearing on plaintiff's motion for a preliminary injunction on February 1, 1979. Plaintiffs are the Princeton Education Association ["PEA"], Connie M. Cox, Jack L. Rudicil, Edgar B. Teets, and Margaret K. Valentine. PEA is an unincorporated association whose membership consists of certified teachers employed by the Princeton City School District ["the District"] and is authorized to sue on behalf of its members pursuant to ORC § 1745.01. Plaintiffs Cox, Teets, Rudicil and Valentine are certified teachers employed by the Princeton City School District. The defendants include the Princeton Board of Education ["the

Board"], Margaret Shardelow, Jerry Mitchell, Clara Gough, Carl Friedman, and G. Mitchell Lippert. The Board is a school board as defined in ORC Chapter 3313, and is charged with the administration of the affairs of the Princeton City School District. Its capacity to be sued is provided for in ORC § 3317. Defendants Shardelow, Mitchell, Gough, Friedman, and Lippert are members of the Board. In addition, defendant Shardelow is president of the Board, and defendant Mitchell is vice president of the Board. Jurisdiction in this Court is founded upon 42 U.S.C. § 1983, and 28 U.S.C. § 1343.

Plaintiffs claim that the Board has on several occasions denied them the opportunity to speak during a portion of Board meetings devoted to public comment on matters pertaining to school administration. Plaintiffs argue that the Board thereby has interfered with and restrained them in the exercise of their First Amendment right to express their views to the Board, and to participate in public discussions during Board meetings. On these matters we hereby enter the following findings of fact and conclusions of law pursuant to Fed.R. Civ.Pro. 52.

At issue in this case is written Board Policy No. 1343 regarding the conduct of Board meetings, which provides:

Every agenda shall provide an item for visitor recognition for residents of the Princeton School District.* The time allotted for this participation shall be at the discretion of the president, but shall in no instance exceed five minutes for any one group or individual. Additional time may be granted by action of the board.

* Employees shall utilize the grievance procedure and consultation procedure when applicable.

\* \* \* \* \* \*

[See Plaintiffs' Exhibit (Pl. Ex.) No. 1 and Defendants' Exhibit (Dft. Ex.) No. 1.] The visitor recognition portion of Board meetings is loosely structured, and public comment is not confined to particular subjects. Non-residents occasionally have been recog-

nized by the Board, but upon learning that a speaker does not reside within the District, the Board generally asks the speaker to be seated. In addition, teachers occasionally have attempted to comment on matters subject to the consultation procedure, but also have been asked to be seated. It appears that speakers occasionally resist such requests by the Board and disruptive outbursts by the audience are not uncommon, particularly on such controversial subjects as the dispute presently before the Court. The Board has had difficulty in conducting the visitor recognition portion of its meetings in an orderly fashion.[1]

The practical effect of the Board's policy is twofold: visitors who are not residents of the Princeton City School District generally are not recognized to address the Board on any subject; and teachers, both resident and non-resident, may not address the Board on subjects to which the grievance procedure or the consultation procedure is applicable. The consultation procedure, described in more detail below,[2] is applicable to all "matters pertaining to terms and conditions of employment," while the grievance procedure, also described in footnote 2, applies to questions or disputes "involving the alleged violation of the personnel policies of the board of education." It excludes matters of broad educational policy, and matters subject to the consultation procedure.

The affidavits and testimony in this case reveal the following chronology of events, leading to this lawsuit: plaintiffs Cox, Valentine, Teets, and Rudicil each have at various times attempted to address the Board during the visitor recognition section of Board meetings, and each has been denied the opportunity to speak.

At a Board meeting on May 8, 1978, plaintiff Valentine approached the microphone during the visitor recognition portion. Defendant Shardelow asked the nature of her business and, upon learning that

---

1. Defense counsel represents that disruptive behavior at Board meetings is approaching the point at which it may become necessary to have a sheriff's deputy present to maintain order. The Board's right to take such steps is discussed *infra* at pp. 967, 968 n.6, 970, and 971–972.

2. The consultation procedure and grievance procedure referred to also are set forth as written Board policies. [*See* Dft. Ex. No. 2.] The consultation procedure is carried out by means of a "consultation team," composed of four PEA delegates and four persons selected by the Board. Board policy No. 4171 states that the team is to meet monthly to "discuss matters of common concern and to consult in good faith on matters pertaining to terms and conditions of employment and such other matters as the parties may agree are the proper subjects for consultation."

Board policy No. 4172 sets forth the grievance procedure. The grievance procedure is applicable to any "question or dispute involving the alleged violation of the personnel policies of the board of education," excepting matters of "broad educational policy," as determined by the board and/or administration, and matters subject to the consultation procedure. The applicable board policy provides for a four-step procedure, including (1) written presentation to the grievant's principal or immediate supervisor; (2) appeal to the appropriate district personnel office; (3) appeal to the superintendent who shall, either himself or through his designee, hold a hearing on the matter; and (4) appeal to the Board of Education, at which a hearing also is provided.

At this juncture, it remains unclear whether any portion of the Consultation Procedure, when it occurs, is open to the public. The Board Policy makes no express provision for notice to the public or public attendance. Testimony by Ruth Crockett, Board Treasurer and Secretary, indicates that there probably is no affirmative notice given to the public of consultation team meetings, but that such meetings may be listed on the School Calendar, which is available to the public. The grievance procedure apparently is not open to the public.

It further appears that the Consultation Team no longer is a functioning body. Plaintiff Rudicil testified that the PEA has voted no longer to send representatives to Consultation Team meetings, owing to the alleged ineffectiveness of the consultation procedure. Apparently one difficulty is that where the PEA and Board representatives are evenly divided on a particular matter, there is no mechanism to break the four-to-four tie. Defendants appear not to contest that the Consultation Team no longer is functioning. It therefore appears to the Court from the evidence presently before it that matters pertaining to the terms and conditions of employment in the Princeton City School District no longer are the subject of formal discussion between the Board and the teachers. Resulting frustrations have given rise to this lawsuit.

Ms. Valentine wished to discuss "Board policies," inquired into Ms. Valentine's residence. Upon learning that Ms. Valentine is not a resident of the Princeton District, after a very brief period, Ms. Shardelow ruled Ms. Valentine out of order on the basis of her residence.

At the Board meeting of November 6, 1978, plaintiffs Cox, Teets, and Rudicil each had a similar experience. Plaintiff Cox took her turn at the microphone, and stated her name and address. Upon learning that Ms. Cox does not reside within the District, defendant Shardelow asked Ms. Cox to be seated. Plaintiff Teets also approached the microphone, and also was asked to take his seat because he is not a Princeton resident. Mr. Teets asked for clarification of the Board's policy not to allow non-residents to address the Board, but was ruled out of order. When Mr. Teets continued to speak, defendant Mitchell forcefully suggested that he take his seat.

Plaintiff Rudicil, who does reside within the District, subsequently approached the microphone, and was asked to state the subject upon which he wished to address the Board. Upon stating that he wished to discuss the Board's refusal to recognize non-residents, two Board members vehemently ruled him out of order. Mr. Rudicil was not permitted to pursue the matter.

Events at subsequent Board meetings were much the same. At the Board's November 27, 1978 meeting plaintiff Valentine again was refused permission to address the Board because of her residence; and at the Board meetings of December 11, 1978 and January 8, 1979, plaintiffs Valentine, Teets, and Cox each again were refused permission to speak because of their residence.

Plaintiffs Teets, Cox, and Rudicil, however, testified that at the December 11, 1978 meeting, Harry Cordell, a non-resident employee, was permitted to address the Board, despite the Board's knowledge that Mr. Cordell is not a Princeton resident. This was substantiated by the testimony of Joseph Snavely, a Princeton resident who was present at the meeting in question. In addition, Cox, Teets, and Rudicil each state that at the December 11 and January 8 meetings, other non-residents, including some teachers among them, were denied permission to speak, expressly because of their residence.

Finally, Pam Packer and Joseph Snavely, both Princeton residents who are not teachers, testified that they were allowed to address the Board during the visitor recognition section on matters pertaining to the Consultation Procedure, and to problems in communication between the Board and the teachers.

In sum, it appears to the Court that the heart of this dispute is a matter of labor relations: non-resident teachers are not allowed to address the Board on any matters, and resident teachers may not address the Board on matters pertaining to terms and conditions of employment or violations of Board policy. This suit does not, however, come before the Court under the labor laws. As in *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471 (2d Cir. 1976),

> This case presents the all-too-familiar situation in which a dispute, commonplace in the private sector, becomes constitutional litigation by virtue of the fact that public employers (the school boards) are involved, rather than private entities, and the plaintiffs are, therefore, able to turn a problem of labor relations into a constitutional issue. Mindful of the undesirability of becoming entangled in the operation of local school systems, we nevertheless must address this case in a constitutional, rather than a private-law, framework. Despite its constitutional gilding, however, this case involves us . . . in the 'unwelcome' task of 'meddling in an intramural fray' among . . . teachers . . . and their board of education employers.

*Id.* at 478, *quoting Fuentes v. Roher,* 519 F.2d 379, 381 (2d Cir. 1975).

Since we have no choice but to consider this case in a constitutional law framework, *see Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–483, 80 L.Ed. 688 (1936) (Brandeis,

J., concurring), the issues presently before the Court are:

(1) whether, given the present structure of Board meetings, the Board may refuse to recognize non-resident teachers during the visitor recognition period;

(2) whether, as the meetings now are structured, the Board may selectively exclude from public comment during the visitor recognition period matters pertaining to labor relations; and

(3) whether, within the present structure of its meetings, the Board may restrain teachers from commenting on matters subject to the grievance and consultation procedures, while allowing other Princeton residents to address the Board on such matters.

We believe that the short answer to each of these questions is no. Thus, on the facts presently before us, we believe that a preliminary injunction should issue.

■ Courts traditionally have considered the following, four factors in determining whether such an injunction is appropriate:

(1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted;

(2) the state of the balance between this harm and the injury that granting the injunction would inflict on the defendant;

(3) the probability that plaintiff will succeed on the merits; and

(4) the public interest.

11 Wright and Miller, *Federal Practice and Procedure: Civil* § 2948 (1973), at 430–31.

The first factor in the analysis clearly weighs in favor of granting the injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct.

2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion) (Brennan, J., joined by White and Marshall, JJ.). In the present case the Board's policy restrains classes of persons from speaking, and/or restricts the subject matter which may be discussed. Thus, if the injunction were denied and the policy later found unconstitutional, plaintiffs will have suffered significant irreparable injury.

■ Consideration of the second factor, a balance of injuries to the respective parties, also weighs in plaintiffs' favor. The Court can discern no injury to the Board from requiring that non-resident teachers[3] be allowed to participate in Board meetings on an equal footing with residents, and from restraining the Board from imposing a subject matter restriction in the form embodied by Board policy No. 1343. The Board may, of course, impose reasonable time, place, and manner restrictions on speakers during the visitor recognition portion of their meetings, so long as such restrictions are imposed without regard to the content of protected speech, and are not utilized to inhibit participation in a public discussion by legally "interested" persons such as non-resident teachers. *See* pp. 969, 970, *infra.* Moreover, this injunction does not affect the Board's unquestioned right to control disruptive conduct at Board meetings by appropriate means.[4] Thus, any injury suffered by the Board will be, at most, *de minimis.*

The third factor, the probability that plaintiff will succeed on the merits, requires the Court to address the constitutional questions presented by this case. Plaintiffs argue that the Board has abridged their First Amendment rights by restraining teachers from commenting on matters pertaining to terms and conditions of employment, and by prohibiting non-resident

---

**3.** Our injunction is limited to the specific factual context of this case. On this aspect of the case (without reference to the subject matter restriction imposed by the Board, which is discussed *infra* ) we require only that non-resident teachers be permitted to participate in Board meetings to the same extent as residents of the Princeton City School District. *See* p. 969, *infra.*

We express no present opinion whether other non-residents who properly may be characterized as disinterested need be allowed to participate.

**4.** The Board's power to control the conduct of its meetings is discussed in more detail below.

teachers from addressing the Board on any matter. This, plaintiffs argue, constitutes an unconstitutional exclusion of interested parties from a public forum.

Defendants' argument is two-fold. First, defendants argue that the First Amendment does not require that the Board provide a forum for discussion of matters pertaining to labor relations, and that the Board uniformly has attempted to adhere to a policy of excluding comment on such matters by any party.[5] In addition, defendants assert that non-residents have no constitutionally protected interest in speaking at Princeton Board meetings, and have no standing to raise the matter in this Court.

The starting point for our analysis is the public nature of the facilities involved. Clearly the state may set aside certain of its property and facilities for purposes inconsistent with the use of that property as a public forum, and the state is not required to provide plaintiffs with a special forum in which to advocate their views. *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d at 480. Once, however, a forum or assembly is opened to use by the public, the state must bear a heavy burden to justify the exclusion of specified groups. *Compare Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). *Cf.* Emerson, *The System of Freedom of Expression* 303 (1971).

[7, 8] On the facts before us, we conclude that the portion of Princeton's Board meetings which is devoted to visitor recognition and participation is a public forum. *See City of Madison, Joint School District*

*No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 178–79, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (Brennan, J., concurring) [hereinafter cited as *"Madison"*]. Even a public forum may, however, be subject to reasonable time, place, and manner restrictions on the conduct which accompanies a particular expression; "[t]he rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 *(Cox I)* (1965). *See Adderly v. Florida,* 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The type of restraint which may be imposed depends upon the circumstances which are present in any particular case. "First Amendment claims must always be adjudicated in light of the special characteristics of the environment involved in the particular case." *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471, 479 (2d Cir. 1976).

The case at bar involves a public school board meeting. The law is clear that at such a Board meeting the Board may confine its discussion to specified subject matter, *Madison,* 429 U.S. at 175 n.8, 97 S.Ct. 421, and probably may structure the discussion of matters that it chooses to open to the public, *id.* at 180, 97 S.Ct. 421 (Stewart, J., concurring). The apparent justification for allowing public bodies to exercise such control is to enable them to control the non-communicative aspect of conduct which accompanies protected expression.[6] Stated

---

5. Defendants steadfastly maintain this position even though Board policy No. 1343 excludes only district employees from commenting on matters subject to the grievance procedure or the consultation procedure. *See* footnote 2 *supra.* At the hearing on this matter defendants' counsel characterized those instances in which the subject matter has been discussed, and in which non-residents have been permitted to speak, as "slip-ups."

6. We recognize that the meaning of the term "non-communicative" conduct is not readily apparent, and we therefore feel compelled to

explain our use of the term. However, because this aspect of First Amendment jurisprudence is highly complex and confusing, our explanation necessarily is oversimplified.

The distinction between speech and conduct is a difficult one, and has been criticized as having no real content. *See* Tribe, *American Constitutional Law* 599 (1978). The difficulty is that all communication involves conduct. So too, much conduct is expressive, a fact which the courts have had no difficulty recognizing in a wide variety of circumstances. *Id., citing inter alia Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (contributing mon-

another way, content-neutral restrictions on matters such as the time and manner of speech may be imposed at public meetings, to enable public bodies to conduct the business of government without undue interruption or distraction.

The Court's task, then, is to ascertain whether Board policy No. 1343 embodies a reasonable time, place, or manner restriction, or whether to the contrary, it unlawfully restrains content or excludes legally interested parties from a public discussion. We tentatively conclude that Board policy No. 1343, as written, violates the First Amendment and the Equal Protection Clause of the United States Constitution.

On the evidence presently before us, the Board's policy may be viewed in two perspectives, both unconstitutional. As written, policy 1343 embodies a mixed class and content restriction. Non-resident teachers are not permitted to address the Board on any matter; and while resident teachers may address the Board, they may not discuss the terms and conditions of their employment, a topic upon which other Princeton residents may comment.

As to the exclusion of non-resident teachers from participation, the law is clear: "the participation in public discussion of public business cannot be confined to one category of interested individuals." *Madison,* 429 U.S. at 175, 97 S.Ct. at 426. We think it too clear for argument that any teacher in the Princeton City School District, whether a Princeton resident or not, is "interested" in the operation of the system within the meaning of the law. Non-resident teachers thus may not be excluded from participation in the visitor recognition portion of Board meetings.[7]

Insofar as policy No. 1434 prohibits teachers from discussing matters pertaining to the terms and conditions of their employment, while allowing discussion of that topic by other residents, the Board also runs afoul of clear constitutional precedent. Teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Community School District,* 393 U.S.

---

ey); *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (displaying flag with peace symbol attached); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing offensive sign on back of jacket); *Schacht v. United States,* 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (wearing uniform); *Tinker v. Des Moines Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands).

The courts have divided expressive conduct into two subcategories: conduct which is akin to "pure speech", *see Tinker v. Des Moines Community School District,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and "speech plus", *Cox v. Louisiana,* 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (*Cox II*) (1965). As Judge Manos explains in *Kucinich v. Forbes,* 432 F.Supp. 1101 (N.D.Ohio 1977),

The extent of the protection afforded conduct varies with the form the conduct takes, and the time and place during which it occurs. If the conduct takes the form of simply and unobtrusively communicating an idea, with the physical action element of the conduct limited to the extent necessary to transmit the idea, then the conduct is *pure expression or speech* and is entitled to the highest degree of protection. . . . When the physical action element of the expression becomes more than just an unobtrusive means

to communicate an idea, then the conduct is called *speech plus* and is entitled to a lower degree of protection than *pure speech.*

*Id.* at 1111 (emphasis in original) (citations omitted). When we refer in the present case to non-communicative conduct, we are referring to the "plus" in speech plus.

As a general matter, we note that to restrict "pure speech" conduct, the state must show that: (1) a clear and present danger is presented to society by the pure speech; (2) the individual's interest in expressing himself is outweighed by the danger to society from allowing the conduct; and (3) the government has used the narrowest restriction on pure expression consistent with the furtherance of the governmental interest involved. To restrict speech plus, the state must show that: (1) a substantial interest of society would be affected by the speech plus conduct; (2) the individual's interest in having the speech plus conduct allowed is outweighed by the potential injury to society; and (3) the government has used the narrowest possible restriction. *See Kucinich v. Forbes,* 432 F.Supp. 1101, 1111–12 (N.D.Ohio 1977), and cases cited therein.

7. As noted previously, we express no opinion on whether non-residents who are not teachers need be allowed to participate. *See* note 3 *supra.*

503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). *See Abood v. Detroit Board of Education,* 431 U.S. 209, 230, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). They "may not be 'compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work.'" *Madison,* 429 U.S. at 175, 97 S.Ct. at 426, *quoting Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Board therefore may not arbitrarily restrain teachers from addressing the Board on a particular topic, relegating them to the consultation and grievance procedure, while allowing the public generally to address the Board on the very same matter.[8] In sum, teachers must be allowed to participate in the visitor recognition portion of Board meetings on the same footing as the public generally.

The Board, however, argues that their policy actually is to exclude all persons from addressing the Board on matters pertaining to labor relations. The Board characterizes those instances in which such matters have been discussed publicly as "slip-ups", or involving mere procedural questions rather than policy matters. Accepting *arguendo* the Board's characterization, we still find that the policy offends the First Amendment as a bare content exclusion.

History and precedent reveal that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).[9] Again, as we stated above, the Board may impose such content-neutral time, place, and manner restrictions, and control the structure of its meetings in such ways as are designed to control non-communicative aspects of the conduct of participants.[10] Incidental restraints on expression are tolerated if the restrictions are narrowly drawn and the governmental interest served by the conduct restrictions is sufficiently important. *See* note 6 *supra.*

We conclude, however, that Board policy No. 1343, as it presently is drawn, is not an appropriate means by which to control the conduct of Board meetings and guard against undue distraction and interruption. Two possible inferences may be drawn from Board policy No. 1343 as written and applied. The first is that the Board understandably wants to keep matters of labor relations confined to the grievance and consultation procedures. If this is the sole justification for the policy, the Board's action clearly is unlawful. As the Supreme Court stated in *Tinker v. Des Moines School District,*

8. We speedily reject the notion that, because they have an alternative forum available (the consultation and grievance procedures), teachers may be precluded from addressing the Board on a topic open to the public generally. "'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975), *quoting Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939). As Professor Tribe puts it, "governmental action that excludes a communication from . . . a public forum cannot be defended by pointing to the availability of alternative ways to transmit the same message; like a governmental abridgment based upon the content of an expression, an abridgment in this special realm is not deemed insignificant simply because alternative channels are available to the speaker or listener." Tribe, *American Constitutional Law* 684 (1978).

At this point we find it pertinent to note that, because the breakdown in the consultation procedure ostensibly is due to plaintiffs' own actions, we have assumed *arguendo* that an alternative forum is available.

9. In our view this case presents the obverse of *Mosley.* The Supreme Court there held unconstitutional a Chicago ordinance which prohibited all picketing within 150 feet of a school except peaceful picketing of any school involved in a labor dispute. The Court found that exclusion from a public forum of all subject matter except a particular topic violated Equal Protection, "not to mention the First Amendment itself." 408 U.S. at 96, 92 S.Ct. at 2290. We find that the Board's action in this case, allowing discussion of any topic except labor relations, amounts to precisely the kind of "selective exclusion from a public place" shunned by the Court in *Mosley.* 408 U.S. at 94, 92 S.Ct. at 2289.

10. *See* note 6 *supra.*

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.

393 U.S. at 509, 89 S.Ct. at 738.[11]

We need not, however, impute to the Board such an impermissible motivation in order to find its policy unconstitutional. A second possible inference (and one we think more likely) is that the Board has assumed that public airing of labor relations matters would be attended by argument and disruptive behavior, and that it is this danger which the Board seeks to avoid.

■ Even in this case the policy must fail to pass constitutional muster as overbroad. As the Supreme Court stated in a similar context, "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Department of the City of Chicago v. Mosely,*

408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1974).[12] *Compare Kucinich v. Forbes,* 432 F.Supp. 1101, 1111 (N.D.Ohio 1977). If the Board is concerned that discussion of particular topics might cause disturbances, it may impose strict, content neutral rules of conduct, and eject unruly participants. Alternatively, in the interest of controlling its agenda and avoiding distractions, the Board may confine public participation and comment to matters on the agenda, or to particular, specified subjects. *See Madison,* 429 U.S. at 175 n.8, 97 S.Ct. 421.[13] Moreover, the Court sees no constitutional impediment to the Board's dispensing altogether with the visitor recognition portion of its meetings.[14] *See* Tribe, *American Constitutional Law* 689 (1978).

In sum, we have found a substantial probability that plaintiffs will prevail on the merits in this case. We therefore turn our attention to the final element in our analysis, the public interest.

■ In view of the foregoing conclusions, we have little difficulty in finding that the public interest favors granting this preliminary injunction. The First Amendment's guarantee of freedom of speech is a

**11.** We recognize that the facts in *Tinker* were markedly different from those before this Court. *Tinker* involved three public school pupils who were suspended from school for wearing black armbands to protest the Government's policy in Vietnam. The Court found that because in wearing the armbands the petitioners were quiet and passive, and did not impinge upon the rights of others, their conduct was "closely akin to 'pure speech'" and entitled to the full protection of the First Amendment. 393 U.S. at 505–06, 89 S.Ct. 733. Hence, the Court in the above-quoted statement treated the school officials' action as a *limitation on the content of protected expression.*

**12.** Professor Tribe observes that in structuring expression in a public forum, the government, "in addition to its usual obligation of content neutrality (an obligation that exists whether or not a public forum is involved), . . . cannot regulate speech-related conduct in such places except in narrow ways shown to be necessary to serve significant governmental interests." Tribe, *American Constitutional Law* 689 (1978).

**13.** The Supreme Court there stated that "public bodies may confine their meetings to specified subject matter." We reiterate that we do not

believe that the rationale for this statement justifies opening public discussion to any and all matters *except* the disfavored topic. *Compare* note .5 *supra.* As the Court stated in *Madison,* "when the board sits in public meetings to conduct public business and hear the views of citizens, it may not . . . discriminate between speakers on the basis of . . . the content of their speech." 429 U.S. at 176, 97 S.Ct. at 426.

We express no present opinion on whether the Board's specification of an agenda for public discussion might become so broad as to be *pro tanto* a sham by which to exclude only disfavored subject matter.

**14.** We do not, however, think this a wise choice. As Justice Holmes stated, dissenting in *Abrams v. United States,*

[T]he ultimate good desired is better reached by free trade in ideas . . . [T]he best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out.

250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919).

cornerstone of our system of government. *See Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1930). In view of the very limited nature of the burden imposed on the Board, the probability that plaintiffs will prevail in a trial on the merits of this case, and in view of the nature of plaintiff's alleged injury, we find that the public interest would be best served by granting a preliminary injunction.

Until further disposition of this case by trial on the merits or other order of this Court, defendants hereby are enjoined from enforcing Board policy No. 1343 as written and as previously applied. This preliminary injunction is, however, limited. We hold only that the Board may not open its doors to public participation and comment which is not confined to particular subjects, and then exclude comment on matters of labor relations and refuse to recognize non-resident teachers.