James A. KELLY et al., Plaintiffs,

v.

**UNITED STATES POSTAL SERVICE et al., Defendants.**

No. C–1–80–058.

United States District Court,
S. D. Ohio, W. D.

April 21, 1980.

Marc D. Mezibov, Furer, Moskowitz, Siegel & Mezibov, Robert Newman, American Civil Liberties Union, Cincinnati, Ohio, for plaintiffs.

James C. Cissell, U. S. Atty., Ann Marie Tracey, Asst. U. S. Atty., Cincinnati, Ohio, D. Richard Froelke, Regional Labor Counsel, Chicago, Ill., for defendants.

## OPINION

DAVID S. PORTER, Senior District Judge:

This matter is before the Court on plaintiffs' motion for a preliminary injunction mandating their reinstatement to the employ of the United States Postal Service (doc 4). An adversary hearing was held March 5, 1980. From the testimony at the hearing, the various affidavits and submissions of the parties, and the memoranda and argument of counsel, we make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiffs are James A. Kelly and Robert N. Hauck. On the days relevant to this action both were employed as mail handlers by the United States Postal Service at its Sharonville, Ohio, Bulk Mail Center ["BMC"]. Plaintiff Kelly worked at the inbound docks of the BMC, unloading mail bags and parcels from trucks and putting them on conveyor belts. Plaintiff Hauck worked in the "dispatch" area adjacent to the inbound docks, putting containers of mail on a conveyor belt.

Defendants are the United States Postal Service, William F. Bolger (Postmaster General), John P. Doran (Regional Postmaster General), K. W. Cooley (District Manager of the Postal Service), William New (supervisor at the BMC) and Robert Twitty (supervisor at the BMC).

The United States Postal Service ["Postal Service"] is an independent establishment of the Executive Branch of the United States Government, created by Act of Congress. 39 U.S.C. § 201. It operates as a quasi-governmental entity directed by a Board of Governors appointed by the President. 39 U.S.C. § 202. Its basic function is to provide prompt, reliable, and efficient postal services to all American communities. 39 U.S.C. § 101.

The BMC is a large facility maintained and operated for the purpose of expediting delivery of the mail. Regulations for employee attire at the BMC state that "[p]ersons working around machinery should wear snug fitting clothing, short sleeves and no neckware or jewelry" and that "[e]mployees will not strip to the waist while working on Postal property." Employees at the BMC have work clothing with political and nonpolitical insignia and messages on them and doing so was not a violation of the dress code.

There are 38 inbound docks equipped with conveyor belts at the BMC. About 35 mail handlers and two supervisors, Robert Twitty and Marvin Worst, work at the docks. Supervisor Twitty does most of the administrative work for the inbound docks and spends a great deal of time seated at a desk that does not allow him to fully view the docks area. Supervisor Worst spends most of his time directing the unloading of trucks at the inbound docks; he assigns workers, usually in pairs, to particular docks. The workday at the BMC inbound docks runs from 7:30 a. m. to 4:00 p. m. Monday through Saturday, with a half-hour lunch break from 11:30 a. m. to noon and a short rest break during the afternoon.

Plaintiffs are represented for collective bargaining purposes by the National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL–CIO ["Union"]. The terms and conditions of their employment are governed by a national collective bargaining agreement which includes a four-step grievance procedure culminating in binding, third-party arbitration. Disciplinary actions available to the Postal Service include "emergency suspension" and "removal." Also available is "progressive discipline" which consists of five steps: (1) letter of warning, (2) seven day suspension, (3) fourteen day suspension, (4) another fourteen day suspension, and (5) removal.

Under the Union-Postal Service agreement an employee's insubordination, which would include failure to obey a direct order given by a supervisor, can bring discharge or other discipline of that employee.

On Saturday, December 8, 1979, plaintiffs reported to work wearing buttons on their

shirts that bore the language "Death to the Shah—U. S. Imperialism get your Bloody Hands Off of Iran." The buttons were about 1½ inches in diameter. Plaintiff Kelly had worn his button to work several days prior to December 8. Just before lunch break Worst informed Twitty that some of the workers were upset about Kelly's button. Just after lunch Joseph Mechley, who is also a mail handler on the inbound docks, took the button from Kelly's shirt and, along with fellow mail handler Steve Edwards, presented it to Twitty, complaining that the language on the button angered them.

At the time the button was presented to Twitty ten to twelve mail handlers, including Kelly had gathered around Mechley and Edwards. Twitty told the group to return to work and they dispersed, except Mechley, Edwards, and Kelly, who remained. Mechley and Edwards stated to Twitty that they did not like Kelly's button because it was "putting down" the United States. Twitty told Mechley and Edwards to give the button to him and return to work. They did so. Twitty then took Kelly to his desk and told him that the button was disruptive and could put him in danger. Kelly asked for return of the button. Twitty told Kelly the button would be returned at the end of the work day and directed Kelly to return to work. After making some statements to Twitty, Kelly returned to work.

At some point during the discussion among Twitty, Mechley, Edwards, and Kelly a request was made for the presence of a Union official. Union steward Joseph Styles, who works as a mail handler in another part of the BMC, was called by Twitty. Styles first spoke with Mechley who informed him that Kelly's button was upsetting because it said "kill all Americans." Styles told Mechley that the situation was not a Union matter. Styles also spoke with Kelly and Twitty individually and told them the situation was not a Union matter.

At the conclusion of his meeting with Kelly, Twitty went to his immediate supervisor James Flamm and discussed the incident. Flamm asked if he should deal with the situation personally. Twitty stated that if he and Worst stayed on the docks the entire afternoon they could keep any disruption from occurring. Flamm instructed Twitty to return the button to Kelly and to tell Mechley and Edwards that any violent acts by them would lead to their dismissal.

Twitty returned to the docks area and gave the button to Kelly, telling him he could wear it. Kelly stated that he would wear a tee-shirt to work Monday that would "really upset the motherfuckers." Twitty then took Mechley and Edwards aside and explained the consequences of any violent acts on their part. Mechley and Edwards said they would not commit any violent acts, but if they were further provoked there was no way they could be stopped. They also informed Twitty that they wanted to start an employee petition regarding the buttons worn by Kelly and Hauck. Twitty said they could not do so while at work.

For the balance of the work day both Twitty and Worst stayed in the docks area and supervised the work. Twitty at one time saw an inscription on the chalkboard in the docks area stating "death to commies" or something similar. Twitty obliterated it. Throughout the afternoon Mechley drove a forklift truck and when passing Kelly's work station he would make shooting gestures with his hands. At one point in the afternoon the mail handler working directly with Kelly told Worst that he did not want to work with Kelly, but, after discussing the matter, said he would finish the day working with Kelly. Worst said he overheard conversation to the effect that some mailhandlers were going to "break Kelly's head." There was tension in the docks area the entire afternoon and the presence of both Twitty and Worst was necessary to complete the unusual work load. No disciplinary actions were taken against any of the mail handlers on the inbound docks that afternoon.

During the afternoon break on December 8 plaintiff Hauck and Mechley were seated

in the BMC cafeteria, along with 40 to 50 others. Mechley was talking loudly and uttering obscenities toward Hauck and Kelly regarding their buttons. At one point Mechley stood up and moved in a menacing way toward Hauck. Almost immediately Mechley was restrained by Edwards and others. Hauck remained seated. Mechley shouted that he would shoot Hauck and Kelly, made shooting gestures with his hands, and then left the room. Twitty was informed of this event but was assured by Mechley that it was "no big deal." Mechley, a disabled Vietnam veteran, is reputed to have a "short fuse." Sometime later in the afternoon Kelly and Hauck conferred and determined they would wear tee-shirts with anti-Shah messages to work the following Monday.

On Monday, December 10, 1979, both plaintiffs came to the BMC wearing the buttons they had worn December 8. They also wore tee-shirts depicting a likeness of the recently deposed Shah of Iran and bearing the language "Shah Wanted, Dead or Alive." The word "Alive" was crossed out with a large X.

Kelly wore his tee-shirt and button under a work shirt which was open in front. The language on the tee-shirt and button were clearly visible. Hauck had on no shirt other than the tee-shirt.

At 7:30 a. m. on December 10, when they would usually report to their work stations, several mail handlers working at the inbound docks gathered near the time clock area and complained about Kelly's tee-shirt and button to Twitty and Worst. Twitty instructed them to go work and they did. Twitty then went to the dock Kelly was assigned to and told him to close his work shirt so that the messages on his tee-shirt and button could not be seen. Kelly, who was at work unloading a truck, asked if Twitty was ordering him to do so for safety reasons. Twitty responded, "for that and other reasons." Kelly refused to follow Twitty's instruction, commenting that Twitty should discipline other mail handlers on the inbound docks because they were the ones not working. Twitty again told Kelly

to cover his tee-shirt and button. Kelly again refused. Twitty told Kelly to come with him to the tour (superintendent's) office. Kelly did so.

During their discussion at the dock Twitty told Kelly that other mail handlers were upset because of his tee-shirt and that he was being removed from the docks area for his own safety. Kelly's attire was not in violation of the BMC dress code and did not present a safety hazard. While Twitty and Kelly spoke a number of mail handlers stopped working to watch. They did so out of curiosity; no violence was threatened. At the time he removed Kelly from the docks area Twitty sincerely believed there was an explosive situation that needed to be defused. Twitty felt violence was imminent.

Just after Kelly and Twitty left the inbound docks area, Hauck, who saw them leave, was approached by his supervisor William New and was told that unless he removed his shirt he would be taken out of the work area. Hauck began to remove his shirt and informed New that by doing so he would be bare chested. New then told Hauck not to remove his shirt. (There is no evidence of any offer to turn the shirt inside-out or any request that such be done.)

Hauck joined Kelly in the office of the tour superintendent. New and Twitty again told Kelly and Hauck to remove their shirts and buttons. They again refused. They were told to wait in the office for further action.

About 1 p. m. the following statement was read to Kelly and Hauck by Twitty and New:

The buttons and shirts you are wearing are purely political and inflammatory in nature, and the order for you to remove this material is for your mutual aid and protection as well as other employees'.

There is sufficient evidence which indicates that the continued display of this material could lead to violence. Saturday, December 8, 1979, is a good example.

As an employer, the United States Postal Service does not have to wait until

an injury occurs if there is a reasonable possibility of violence.

Therefore, I am ordering you to remove the material and go back to work.

Should you fail to obey the order to remove this material, it will result in your discharge from the Postal Service for failing to obey a direct order.

Both plaintiffs stated they understood the order and refused to comply with it. They remained in the tour office.

At about 3 p. m. Kelly and Hauck received typewritten notices of proposed emergency suspension signed by their supervisors and Jerry G. Grant who was the BMC's designated reviewing authority for disciplinary matters. The notice given to Kelly stated that the wearing of the tee-shirt and button "caused tension on the workroom floor," "resulted in a confrontation between you and several other mail-handlers," and "could result in physical harm to yourself and others." Kelly's notice concluded that he had refused to obey an order and that he had to be removed from the premises for the protection of himself and others.

The notice given to Hauck stated that his tee-shirt and button had "caused tension on the workroom floor and could result in physical harm to yourself and others." The notice further stated that Hauck had refused to obey an order to remove the shirt and button and that he had to be removed from the premises for the protection of himself and others.

After reading and acknowledging their notices Kelly and Hauck left the BMC.

Sometime on December 10 Twitty was presented a petition signed by 37 mail handlers stating

. . . Joseph P. Mechley and the undersigned protest working with Bob Hauck and James Kelly my co-workers who are members of the Revolution Communist Party. Bob Hauck and James Kelly are parading themselves with anti-American buttons.

Bob Hauck and James Kelly are *provoking violence* by wearing these anti-Americanism badges. This is obnoxious and offensive to the American patriots and is definitely creating unpleasant working conditions.

On December 17 Kelly received a "notice of removal" signed by Twitty and Grant stating that he would be removed from the Postal Service on January 21, 1980 because he had failed to obey a direct order. On December 18 Hauck received a "Letter of Decision—Emergency Suspension" stating he would be suspended for 30 days effective December 24. On December 20 Hauch received a "Notice of Charges—Removal," signed by New and Grant stating that his removal from the Postal Service was proposed because he failed to obey a direct order. On January 11, 1980 Hauck received a "Letter of Decision" signed by Paul P. Manning, BMC general supervisor, informing him he would be removed from the Postal Service effective January 25, 1980 because he had failed to obey a direct order.

Pursuant to the grievance-arbitration procedure in the collective bargaining agreement between the Union and Postal Service, Kelly and Hauck filed timely grievances for their suspensions and removal. The third step of the procedure had been completed with respect to each grievance and they have thus far been denied. The fourth step, presentation to an arbitration panel, is scheduled for April 11, 1980. The panel includes a professor from Notre Dame University.

The Court takes judicial notice of the fact that at the time Kelly and Hauck wore their shirts and buttons to the BMC about 50 employees of the United States Embassy in Teheran, Iran, had been held hostage by Iranian militants for about four weeks. The taking of the hostages was precipitated by the entry of the deposed Shah of Iran into the United States for medical treatment. Americans generally were frustrated and mad at this humiliating turn of events. Outrage against Iranians and their sympathizers was the order of the day.

At the hearing Twitty and Worst described the general situation at the inbound docks of the BMC as volatile. They stated

that if Kelly and Hauck returned to work violence would be imminent and they would be unable to stop it.

## CONCLUSIONS OF LAW

### I.

Before getting to the merits of plaintiffs' request for preliminary injunction, we must decide whether the Court has jurisdiction over the controversy. Defendants assert that this Court lacks subject matter jurisdiction and that the matter is exclusively for the National Labor Relations Board.

The United States Postal Service is subject to the Labor Management Relations Act (LMRA) and the jurisdiction of the National Labor Relations Board (NLRB), 39 U.S.C. § 1209. LMRA § 7, 29 U.S.C. § 157, provides:

> Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . . .

LMRA § 8(a)(1), 29 U.S.C. § 158(a)(1) states:

> (a) It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C. § 157]. . . .

When an employer interferes with an employee's § 7 rights, the employee may file a charge with the NLRB. 29 U.S.C. § 160(b). The NLRB is empowered to issue complaints, hold hearings, and make orders regarding the charge. 29 U.S.C. § 160(b), (c). The orders may be enforced by United States Courts of Appeals and District Courts. 29 U.S.C. § 160(a). The NLRB may also petition a District Court for an order enjoining the employer's action prior to issuing its own order. 29 U.S.C. § 160(b). See generally, Gorman, Basic Text on Labor Law, 7–9 (1976).

As a general rule, when an activity is arguably subject to LMRA § 7 or § 8, federal courts must defer to the special competence of the NLRB. *San Diego Unions v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Employee speech regarding concerns of employees as employees is protected by LMRA § 7 and any employer action punishing such speech is a potential unfair labor practice under LMRA § 8(a)(1). *Eastex, Inc. v. NLRB*, 437 U.S. 556, 563–70, 98 S.Ct. 2505, 2511–14, 57 L.Ed.2d 428 (1978). In such a case, deference to the NLRB's jurisdiction is required, even if a constitutional claim is involved. *See Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

The Supreme Court has stated, however, that "[t]here may well be types of [employee] conduct or speech that are so purely political or so remotely connected to the concerns of employees as employees as to be beyond the protection of [LMRA § 7]." *Eastex, Inc. v. NLRB, supra*, 437 U.S. at 570 n.20, 98 S.Ct. at 2515 n.20. This statement supports an earlier NLRB determination that a private employer's censure of a purely political tract distributed by an employee did not constitute an unfair labor practice. *Ford Motor Co.*, 221 NLRB 663, 666 (1975), *enf'd* 546 F.2d 418 (3d Cir. 1976).

The messages contained on the tee-shirts and buttons of the plaintiffs in this case easily fall into the category of "purely political." Indeed the statement read to plaintiffs by their supervisor identified them as purely political. They criticize American foreign policy and recommend dire consequences for a deposed foreign leader. The messages do not relate to plaintiffs' jobs or to their status or condition as employees. They are not connected to the interests of employees as employees and therefore are not protected from employer censure by LMRA § 7. The actions of the Postal Service in this case do not then constitute an unfair labor practice under LMRA § 8(a)(1). Deference to the jurisdiction of the NLRB is not required; indeed the NLRB's jurisdiction could not be invoked in this matter.

■ While plaintiffs are without the protection of LMRA § 7 in this case, they are not without the rights guaranteed by the First Amendment to the Constitution. Because the Postal Service is an agency of the federal government, it must respect the First Amendment rights of those it comes in contact with, *Tucker v. Texas*, 326 U.S. 517, 520, 66 S.Ct. 274, 275, 90 L.Ed. 274 (1946), including its employees. *Beilan v. Board of Public Education*, 357 U.S. 399, 405, 78 S.Ct. 1317, 1321, 2 L.Ed.2d 1414 (1958). Plaintiffs' allegation of violation of their free speech rights by the Postal Service necessarily states a federal cause of action and the lack of preemption by the NLRB puts the issues squarely before this Court. The fact that plaintiffs were public employees does, however, enter into our resolution of those issues.

■ Plaintiffs' pursuit of the grievance-arbitration process available to them because of the collectively bargained contract between the Union and the Postal Service does not bar this Court's determination of the issues before it. As a general rule, national labor policy dictates that a court should not entertain a civil suit by an employee who has not exhausted an available grievance-arbitration remedy. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *see United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). This policy gives way however when the employee suffers irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 84–92, 94 S.Ct. 937, 950–53, 39 L.Ed.2d 166 (1974). Plaintiffs here have alleged violation of their First Amendment rights. Such violation would, as a matter of law, constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion). Hence, this Court need not await exhaustion of the grievance-arbitration process plaintiffs have pursued.

In sum, we conclude that this suit does not come before us as a matter of labor law and we must therefore consider it within a constitutional law framework.

## II.

■ In determining whether a preliminary injunction should issue courts have traditionally considered four factors:

(1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted;

(2) the state of the balance between this harm and the injury that granting the injunction would inflict on the defendant;

(3) the probability that plaintiff will succeed on the merits; and

(4) the public interest.

*Princeton Ed. Assn. v. Princeton Bd. of Ed.*, 480 F.Supp. 962, 967 (S.D.Ohio 1979). 11 Wright & Miller, F P & P Civil § 2948 (1973) at 430–31.

Applying these factors to the facts of this case we find the first factor weighs in favor of granting an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, supra*, 427 U.S. at 373, 96 S.Ct. at 2690. The Postal Service's suspension and dismissal of plaintiffs was a direct consequence of their refusal to obey a direct order regarding their speech activities. The Postal Service does not contend its actions were taken for any other reason. *See Mt. Healthy Board of Ed. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977). If an injunction was denied and the Postal Service's actions were later found unconstitutional, plaintiffs will have suffered irreparable harm. *Cf. Princeton, supra*, 480 F.Supp. at 967.

Consideration of the second factor, a balance of injuries to the respective parties, also weighs in the plaintiffs' favor. If plaintiffs were reinstated in their jobs there is little doubt that their presence on the work floor would cause tension and there would be a potential for violence. In order to minimize disruption and continue the expeditious processing of the mail the Postal Service will have to provide close supervision of the work at the BMC's inbound docks. The facts show that when mail han-

dlers on the dock were closely supervised, they carried out their jobs despite the presence of plaintiffs and their attire. This close supervision would undoubtedly have to continue as long as the hostage crisis exists, but we doubt if it would have to continue interminably. While it continues the supervisory resources of the Postal Service would be strained. This burden, which would likely include extra expense for the needed supervisory personnel, does not, however, amount to an injury that would outweigh the irreparable harm plaintiffs would suffer by the denial of their First Amendment rights.

The third factor, the probability that plaintiffs will succeed on the merits, requires the Court to address the constitutional questions presented by this case. Plaintiffs claim the Postal Service suspended and dismissed them because of the language on their tee-shirts and buttons. This, plaintiffs argue, amounts to an abridgement of their First Amendment right of free speech.

At the outset we note that the language on plaintiffs' buttons and tee-shirts is, for constitutional purposes, "pure speech." *See Tinker v. Des Moines Community School District*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969). As such it is entitled to the highest degree of protection available under the circumstances. *Kucinich v. Forbes*, 432 F.Supp. 1101, 1111 (N.D. Ohio 1977).

In the context of public employees' exercise of free speech rights the Supreme Court has announced that

> [t]he problem in any case is to arrive at a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Bd. of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *see Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979).

We find this "balancing" test of limited value in the case at bar because it has been applied by the Supreme Court only in situations where the employees have said something disparaging about their employers. *See Givhan, supra*, 439 U.S. at 412–13, 99 S.Ct. 693, 694–95, 58 L.Ed.2d 619; *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann*, 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2696–98, 33 L.Ed.2d 570 (1972); *Pickering, supra*, 391 U.S. at 565–68, 88 S.Ct. at 1733–34. This is not the case here. The language on plaintiffs' tee-shirts and buttons was in no way aimed at the Postal Service or any person with whom they would be in contact during the course of their daily work as mail handlers. If this test did apply in this case, the balance would tip in favor of the plaintiffs because the language on their shirts and buttons concerns a matter of legitimate public concern, not an intramural dispute, and does not, by its very nature, "inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942); *see Cohen v. California*, 403 U.S. 15, 20–23, 91 S.Ct. 1780, 1785–1787, 29 L.Ed.2d 284 (1971). There is no doubt the language caused disruption, but not because it attacked the Postal Service. Because plaintiffs' language was commenting on a matter of general public concern which had no relation to the business of the Postal Service, the Postal Service's interests as an employer in regulating the speech of its employees is not significantly greater than its interest in limiting similar language expressed by a member of the general public. *Pickering, supra*, 391 U.S. at 573, 88 S.Ct. at 1737.

As a general matter, to restrict "pure speech" the government must show that:

(1) a clear and present danger is presented by the pure speech,

(2) the individual's interest in expressing himself is outweighed by the danger from allowing the pure speech, and

(3) the government has used the narrowest restriction on pure expression con-

sistent with the furtherance of the governmental interest involved.

*Princeton, supra,* 480 F.Supp. at 969 n.6; *Kucinich v. Forbes, supra,* 432 F.Supp. at 1111 and cases cited therein. As noted by the Supreme Court early on,

> The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils Congress has a right to prevent. It is a question of proximity and degree.

*Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).

Viewing the facts of this case in light of the three requirements outlined above we conclude the plaintiffs have a high probability of success on the merits. The danger presented by their wearing of the tee-shirts and buttons is violence and physical injury on the inbound docks and disruption of the handling of the mail. Whether this danger is clear and present requires consideration of the circumstances in which the speech takes place. The BMC is not a public assembly hall or school. Its purpose does not include the fostering of exchange of views on matters of public concern. Its supervisory force is not charged with the duty of insuring that employees get to present their views on current political issues. Nevertheless, the facts of this case lead us to conclude that the existing supervisory force can maintain the expeditious processing of the mail without speech-related disruptions. On December 8 supervisor Twitty left the docks area to talk with James Flamm about the button incident, thus leaving Worst as the sole supervisor there, and no disruption occurred. Indeed, throughout December 8 no disruptions occurred and no disciplinary actions were taken. Further, the cafeteria confrontation between Mechley and Hauck, where Mechley was restrained by other employees, tends to show that plaintiffs' co-workers will actively avoid disruptions.[1] The danger of violence and disruption in these circumstances is not "clear and

present." The fear of Twitty and Worst that some violence may take place in the future is sincerely held and not unwarranted, but it is insufficient as a foundation for a finding of clear and present danger.

Determining whether plaintiffs' interest in expressing themselves is outweighed by the danger from allowing their speech is difficult in this case. It is unclear, first of all, whether plaintiffs' interest in wearing their buttons and tee-shirts to the BMC is to state their own personal opinions, to persuade others to their point of view, or to cause irritation among their fellow mail handlers. Their audience at the BMC is small and obviously hostile, so it is unlikely that any efforts at persuasion would be successful. Further, plaintiffs are free to wear their attire elsewhere; they are not losing their only available forum when not allowed to wear them to the BMC. Finally, it is clear plaintiffs wore their tee-shirts on December 10 at least in part to taunt certain of their co-workers. Nevertheless they are public employees and citizens and their work place does not disallow the displaying of political messages on clothing. Hence, they have an interest in being able to participate in whatever exchange of political ideas takes place at the BMC. The dangers that may result from plaintiffs' tee-shirts and buttons are violence and disruption. While supervisor Twitty genuinely fears the occurrence of these dangers, we conclude, as noted above, that the likelihood of their occurrence is low—especially if the competent leadership and supervision of Twitty and Worst continues. With the likelihood of the dangers occurring being low, the plaintiffs' interest in expressing their political ideas, though not overwhelming, outweighs them.

The Postal Service has not used the narrowest restriction over pure expression consistent with the furtherance of the governmental interest involved. Specifically removing Kelly and Hauck could be seen as narrow restriction. It is, however, a specific exercise of a very broad, arbitrary re-

---

1. But, as noted above, most of plaintiffs' co-workers have signed a petition stating that the language on plaintiffs' buttons and tee-shirts was "provoking violence."

striction which is in essence that anyone stating an opinion that angers others may be removed willy-nilly. This is a restriction of frightening proportions. Even without specific regulation the Postal Service could have taken lesser steps than suspension and removal to defuse the perceived difficulties. Plaintiffs could have been moved to another area, or those who threatened violence could have been moved to another area or reprimanded.

The major difficulty with this case is that the Postal Service did not regulate the time, place and manner of political speech at the BMC. The purpose of the facility is not speech related and restrictions on political speech could be severe if not total. *See United States v. Douglass,* 579 F.2d 545, 549 (9th Cir. 1978). The Postal Service chose however not to promulgate any restrictions on political language or emblems on clothing worn to the BMC. Hence, by suspending and removing plaintiffs' for wearing the tee-shirts and buttons the Postal Service was in effect, restricting the content of plaintiffs' speech, not the time, manner or place of its expression.

Any restriction on expression must be content neutral. *Princeton, supra,* 480 F.Supp. at 968–69.

> Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content (citations omitted) . . . The essence of forbidden censorship is content control. Any restriction on expressive activity would completely undercut the "profound rational commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 720, 11 L.Ed.2d 686].
>
> . . . Government may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," (footnote omitted) and government must afford all points of view an equal opportunity to be heard.

*Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–6, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Having chosen to allow political speech at the BMC the Postal Service is not free to censor that which some or all of its supervisors and employees dislike.

With or without regulation the Postal Service is not helpless in the face of substantial disorder. Behavior which materially disrupts the workplace or involves substantial disorder or invasion of the rights of others is not immunized by the constitutional guarantee of freedom of speech. *Tinker v. Des Moines School District, supra,* 393 U.S. at 513, 89 S.Ct. at 740. But in order to stop such behavior the government must show that the expression is directed to "inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). We cannot conclude on the facts before us that the language on plaintiffs' tee-shirts and buttons was so directed. The language was no doubt upsetting to many of their co-workers and there is no doubt that plaintiffs wore the tee-shirts on December 10 to upset some of their co-workers, but these facts do not amount to "inciting or producing imminent lawless action" *Brandenburg v. Ohio, supra.* The plaintiffs wanted to disturb people, but they did not intend to cause violence. Also it is unlikely that the plaintiffs' tee-shirts and buttons would incite or produce lawless action. The events of December 8 show that all but one of the mail handlers on the inbound docks were able to fully restrain themselves and do their usual work. We cannot conclude that the anger of one short-tempered person is an adequate basis for finding lawless action is imminent. *Compare Krause v. Rhodes,* 570 F.2d 563, 570–72 (6th Cir. 1977).

It is true that if members of a mob have vowed before hand to act violently when a certain person speaks, that person will incite a riot by saying anything at all. In such a case however it is the obligation of the government to chastise the violent, not the verbal. Antieau, Modern Constitutional Law § 1.7, pp. 22–25 (1969). To do other-

wise would put the right of free speech at the mercy of those who threaten disruption. "Constitutional rights may not be denied simply because of hostility to their expression or exercise." *Cox v. Louisiana*, 379 U.S. 536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965); *see Collin v. Smith*, 578 F.2d 1197, 1206 (7th Cir. 1978) (Nazi "Skokie March" case). The obligation of government authorities is to do everything possible to suppress violence from members of the mob who would deny the opportunity to speak. Antieau, *supra* at 25.

It is doubtful that the Postal Service could satisfy the "heavy burden" of justifying their decision to suspend and remove plaintiffs on the basis of imminent lawless action. *Healy v. James*, 408 U.S. 169, 184, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). Therefore, we conclude that the Postal Service will have difficulty making the showing required to suppress pure speech. Plaintiffs have a high probability of success on the merits at trial. The third factor weighs in favor of granting a preliminary injunction.

In view of the foregoing conclusions, we find that the public interest favors granting a preliminary injunction. The First Amendment's guarantee of freedom of speech is a cornerstone of our system of government. *See Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1930). In view of the very limited nature of the burden imposed on the Postal Service, the probability that plaintiffs will prevail in a trial on the merits, and irreparable nature of plaintiffs' alleged injury, we conclude that the public interest would be best served by granting of a preliminary injunction.

We also think it pertinent to observe that the events that lead to this lawsuit were caused in part by strong patriotic sentiments. Plaintiffs' co-workers felt, and this Court sympathizes, that plaintiffs endorsed the lawless, humiliating actions that had been taken against American Embassy employees in Iran. To disagree with, and indeed be offended by the messages carried by plaintiffs' buttons and tee-shirts are cer-

tainly valid feelings. But to take action against plaintiffs because of the political ideas they espouse is clearly unlawful and just as clearly unpatriotic. For to punish those that endorse unpopular ideas is to punish the individualism and pluralism that have given the United States the strength to carry on its democratic government. Along with their right to speak and believe as they please all Americans have the responsibility to tolerate the speech and beliefs of those they disagree with. If we do not practice such tolerance we will become something less than a free, and independent people.

## CONCLUSION

A recent case we have found illuminating while pursuing this decision is *Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978). In that case the Circuit Court affirmed a District Court determination that enforcement of local ordinances aimed at stopping Nazi Party members from parading through a predominantly Jewish village violated the First Amendment rights of the Nazis. We can find no more appropriate words now than those used by Judge Pell to conclude his majority opinion:

"The result we have reached is dictated by the fundamental proposition that if these civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises." 578 F.2d at 1210.

Until further disposition of this case by trial on the merits or other order of this Court, defendant, United States Postal Service, is mandatorily enjoined to (1) reinstate plaintiffs in the job classification and salary level they held at the time of their suspension, (2) pay plaintiffs all income that would have accrued to them from the time of their suspension until the time of their reinstatement, and (3) insure that plaintiffs suffer no loss of seniority or other job benefits because of their absence. All parties shall inform the Court of the final determination of the grievances plaintiffs have filed pursuant to the collective bargaining contract

between the Union and the United States Postal Service. Upon receiving such information we will determine what further proceedings in this Court are necessary.

So ordered.